UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| KEVIN JOHNSON, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | No. 2:20-cv-00602-MPB-MJD |
|  | ) |  |
| ROBERT E. CARTER, JR., et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

# ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT

Plaintiff, Kevin Johnson, filed this lawsuit when he was incarcerated by the Indiana Department of Correction ("IDOC") against several various defendants alleging that they were responsible for violating his rights under the First, Eighth, and Fourteenth Amendments to the Constitution. The defendants move for summary judgment and, despite having ample opportunity to do so, Mr. Johnson has not responded. For the reasons that follow, the motion for summary judgment is **GRANTED**.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A

court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Mr. Johnson failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572-73.

### A. The Parties

Mr. Johnson was transferred from Virginia prison to Indiana in November 2018. Dkt. 137-1 at 15:14-16 (Johnson Dep.). He was housed at Pendleton Correctional Facility ("PCF") during the times relevant to his complaint. Dkt. 1 at 1-2; dkt. 137-2 at 3 (Location History). Before his incarceration in Indiana, he was incarcerated in Virginia, Texas, Florida, and Oregon. The Virginia Department of Corrections requested that Mr. Johnson be transferred to Indiana because he "continually opposed Virginia's security practices, policies and procedures" and he "has a propensity toward violence and attempts to assault staff when he feels it will promote his radical ideology." Dkt. 137-3 at 3-4 (Interstate Corrections Compact Documents).

Robert Carter served as the Commissioner of the IDC from January 2017 through October of 2022. Dkt. 137-14 ¶ 3 (Carter Affidavit).

Mary Kay Hudson is the Executive Director of Court Services for the Indiana Judicial Center, an agency of the Indiana Supreme Court, as well as the commissioner of the Interstate Commission for Adult Offender Supervision for Indiana.[1]

Dushan Zatecky was the Warden of PCF from March 2013 until July 2020. Dkt. 137-6 ¶ 3 (Zatecky Affidavit). As the Warden, he oversaw the operation of the entire facility. *Id.* Dennis Reagle was the Assistant Warden and later the Warden. Dkt. 137-4 ¶ 3 (Reagle Affidavit).

Laura Bodkin worked at PCF as the American Correctional Association and Policy Manager, Prison Rape Elimination Act Compliance Manager, and Supervisor to the grievance specialist. Dkt. 137-7 ¶ 3 (Bodkin Affidavit). She did not have authority or involvement in determining where an inmate was housed at PCF. *Id.* ¶ 4. She was not involved in maintaining the cleanliness of the facility, and if an inmate would complain to her about the conditions of the

---

[1] https://interstatecompact.org/midwest/indiana#:~:text=Mary%20Kay%20Hudson&text=Hudson%20is%20a%20governor's%20appointee,Social%20Work%20from%20Indiana%20University

facility, she would forward their complaint to the PCF staff member who was best situated to address their complaint. Dkt. 137-7 ¶ 5.

D. Davis was the personal property department supervisor. Dkt. 1 at 2.

Christina Conyers was a grievance specialist during the time of Mr. Johnson's claims. Dkt. 137-12 ¶ 3 (Conyers Affidavit). C. Williams and J. Lyttle were grievance appeal administrators. Dkt. 1 at 1-2. Veyona Shepherd was a grievance specialist and segregation unit case manager. Dkt. 1 at 1.

Yolanda Chambers was the mailroom supervisor. Dkt. 137-10 ¶ 3. As the mailroom supervisor, she oversees all incoming and outgoing mail to PCF. *Id.* ¶ 4.

Aaron Long worked in Investigations and Intelligence ("II"). Dkt. 1 at 1. Brock Turney was the assistant lead investigator for II. Dkt. 137-8 ¶ 10. Sean Wyatt was also an internal affairs officer. Dkt. 1 at 1.

Jon Ferguson is identified as the chief legal official of the IDOC. Dkt. 1 at 1.

Dawn Reynolds is identified as the telephone system coordinator. Dkt. 1 at 2.

Tabitha Cochran and Chad Evans were a segregation unit case managers. Dkt. 1 at 1. John Safford was the segregation unit team manager. Dkt. 1 at 1.

### B. Mr. Johnson's Placement in Restrictive Housing

When Mr. Johnson was transferred to PCF, he was placed in G Cell House, a restrictive status housing unit, under Department Wide Administrative Restrictive Status Housing ("DWARSH"). Dkt. 137-1 ¶ 4. DWARSH is used to house inmates who demonstrate a history of assaultive behavior, members of Security Threat Groups ("STGs"), inmates under investigation, inmates who demonstrate a history of behavior of violating rules which would be detrimental to the security of the facility, and as a temporary assignment for an offender awaiting available

general population assignment. *Id*. at ¶ 7. Mr. Johnson alleges that Defendants Long, Nelms, Reagle, Zatecky, and Bodkin claimed that he was in a STG and signed off on the classification disposition to hold him in solitary confinement. Dkt. 137-1 at 79:8-21. Mr. Reagle testifies that Mr. Johnson was placed in DWARSH because he had an extensive disciplinary record in previous facilities where he was housed in other states. Dkt. 137-4 ¶ 5, 6. The decision to place Mr. Johnson in DWARSH was made by IDOC central office. *Id.* Mr. Johnson remained in G Cell House until March 11, 2020. Dkt. 137-2 at 2 (Location History).

While he was in DWARSH, Mr. Johnson received several classification reviews and hearings which eventually led to him being recommended for transfer from DWARSH. Dkt. 132-5 at 1, 10, 16, 18, 19, 23, 26. He was regularly evaluated by a psychologist who ruled that he was not a high risk to decompensate if placed in a secure confinement unit. Dkt. 137-5 at 20, 48. Starting in July of 2019, Mr. Zatecky began writing letters to IDOC central office recommending that Mr. Johnson be transferred from DWARSH to ARSH to begin the process of being moved into general population. Dkt. 137-5 at 27 (Classification Records)**;** dkt**.** 137-6 ¶ 8. It generally takes at least six months from the date of the initial request to remove an inmate from DWARSH to general population because of the need for approval from IDOC central office and because the facility must wait for an appropriate bed to open in general population. Dkt. 137-4 ¶ 11.

Mr. Johnson claims that, while he was in DWARSH, he was exposed to smoke from constant fires, feces, cockroaches, trash piles, unsanitary food, and noise. Dkt. 137-1 at 89:6-18. He wrote letters to Defendants Zatecky, Carter, and Safford, and made complaints to other PCF staff. *Id*. at 90:2-25. He also claims that he suffered from hypertension, and that a doctor told him that it was from distress of his environment. *Id*. at 93:18-24.

### C. Access to Attorney Claims

Mr. Johnson claims that he had active cases in Virginia while he was incarcerated at PCF. Dkt. 137-1 at 20:18-25. He intended to file lawsuits related to his incarceration in Texas. *Id*. But he was not represented by an attorney in any active or potential cases. *Id.* at 21:25-21:4.

Mr. Johnson states that he filed the necessary forms to be approved to communicate by phone with attorney Dustin McDaniels from Pennsylvania, but his request was denied because "they could not confirm that he was an actual lawyer." *Id*. at 21:14-25. He also explains that he had Mr. McDaniels send his bar card and a letter stating that he was willing to assist Mr. Johnson on legal matters. *Id*. at 22:1-7. Warden Zatecky notified Mr. Johnson that his attorney's credentials had been approved, but his phone number was never added to his call list. *Id*. at 22:8-19.

On another occasion, Mr. Johnson tried to call attorney Rich Waples about claims he intended to bring in Indianapolis, but states that he was required to place the call in Defendant Evans's office with him listening. *Id*. at 27:1-7.

### D. Claims Regarding Mail and Periodicals

Mr. Johnson claims that Defendants Dennis Davis, Christina Conyers, Yolanda Chambers, Aaron Long, Brock Turney, Sean Wyatt, and Jon Ferguson violated his First Amendment rights by denying his receipt of certain periodicals. Dkt. 1 at 18; Dkt. 7 at 8. Mr. Johnson stated that he was told that the periodicals were denied due to unspecified security risks. Dkt. 137-1 at 57:5. Mr. Johnson appealed the denials of his periodicals through the grievance process and Defendants Conyers and Chambers denied his grievances. *Id*. at 61:12-16.

Yolanda Chambers has been the Mail Room Supervisor at PCF since 2018. Dkt. 137-10 at 1, ¶¶ 3-6. She oversees all incoming and outgoing mail to PCF, which houses approximately 1,900 offenders. *Id.* The mail room staff inspects every individual piece of mail. *Id.* If a piece of

incoming mail has any potential to threaten the security of the facility according to the policy on Offender Correspondence, mail room staff would notify Ms. Chambers, and she would alert the II team. *Id.* Ms. Chambers has no authority to determine whether a specific piece of information given to II should be confiscated, and all decisions as to whether that piece of mail should be confiscated is made by the II team. *Id*. at 2, ¶¶ 8-9.

Jon Ferguson was the Chief Legal Officer for the IDOC from 2019 through 2022. Dkt. 137-11 at 1 ¶¶ 2-5. His job duties consisted of administrative tasks and oversight of the legal division of the IDOC. *Id.* When an offender sent him correspondence, he would forward the correspondence to the appropriate division or area that oversaw that particular matter. *Id.*

Christina Conyers has worked at PCF since May of 2017 and became a grievance specialist around July 1, 2019. Dkt. 137-12 at 1-2, ¶¶ 3-9 (Conyers Aff.). Ms. Conyers is required to follow IDOC policy in answering offender grievances. *Id.* When she received grievances from Mr. Johnson regarding his mail being withheld from him, she forwarded it to either the investigations and intelligence team, or the mail room staff who was named in the complaint. *Id.* Ms. Conyers was not involved in any decisions to withhold or destroy Mr. Johnson's mail. *Id.*

Mr. Turney reviewed several pieces of mail addressed to Mr. Johnson for potential security threats. Dkt. 137-8 at 2, ¶ 10. This included periodicals such as the *San Francisco Bay View* and the *Militant*. *Id*. ¶ 11. Determinations as to whether a specific piece of mail posed a security threat were made on a case-by-case basis, meaning that each item was reviewed individually. *Id*. ¶ 12. Periodicals to which Mr. Johnson subscribed were confiscated on occasion because they called for protests within the facility, which the II team determined could lead to violence within the facility. *Id*. ¶ 13. On other occasions, the II team reviewed Mr. Johnson's mail and determined that there was no security threat and allowed the mail to go through to Mr. Johnson. *Id*. ¶ 14.

### E. Plaintiff's Eighth Amendment Claims

Mr. Johnson claims that, "[i]n PCF solitary unit officers frequently abuse gas on its occupants, and defendants Carter, and Zatecky refuse and fail to provide a system of evacuating gas from the cellhouse, decontaminating cells in which gas is sprayed or providing medical care or fresh air to those bystanders." Dkt. 1 at 29. Further, he claims that he suffered numerous bystander gas attacks without relief in this manner. *Id*. at 29. Mr. Johnson stated that he was exposed to tear gas approximately once a month. Dkt. 137-1 at 94:14.

On July 8, 2019, Defendant Davis deployed MK 90 on an inmate who threw a cup of urine on him. Dkt. 137-13 at 1 (Incident Report). The MK 90 was not targeted at Mr. Johnson, but tear gas entered his cell. *Id*. (Johnson Dep. at 94:23). Mr. Johnson claims that he notified Defendant Johnson that he had been exposed. He asked to be decontaminated, but he does not remember what Defendant Johnson said back to him. *Id*. at 100:13-25.

### F. Plaintiff's Retaliation Claims

Mr. Johnson alleges in his complaint that he is a widely published artist and author on topics such as politics, history, philosophy, economics, culture, black and other ethnic studies, and prison conditions. Dkt. 1 at 6. He claims that his "confinement in the IDOC…by defendants Carter, Hudson, Bodkin, Zatecky, and others, especially while at PCF, has been politically motivated, in retaliation for, and in response to and calculated to suppress his political views and expression and the content of his writings, especially those about jail and prison conditions." *Id.*

Defendant Zatecky was aware that Mr. Johnson had written several articles in various forums complaining about various aspects of his incarceration at PCF; however, he never took any negative action against Mr. Johnson because of any article that he wrote or any complaint or grievance that he filed. Dkt. 137-6 at 2, ¶¶ 13, 14.

Defendant Carter was the Commissioner of the IDOC from January of 2017 through October of 2022. Dkt. 137-14 ¶¶ 5-6. He oversaw the operation of the entire agency and had minimal involvement in the day-to-day operations of the IDOC facilities and was not involved in the implementation of policies at the facility level. *Id.*

## III.
## Discussion

Based on the Court's February 3, 2021, screening order, dkt. 7, and September 2, 2021, order granting Mr. Johnson's motion to identify additional claims, dkt. 55, the following claims are proceeding in this case:

- First Amendment retaliation claim that defendants Carter, Hudson, Bodkin, and Zatecky mistreated him because he wrote articles that were critical of jail and prison conditions;

- First Amendment Claim that Mr. Johnson was denied periodicals and other materials to which he had a subscription against Defendants D. Davis, Conyers, Chambers, Long, Turney, Wyatt, and Ferguson;

- First Amendment Claim that Mr. Johnson was denied the right to speak to his attorney and that he was denied confidential phone calls with his attorney against defendants Reynolds, Turney, Williams, Shepherd, Cochran, Zatecky, Safford, Evans, and Lyttle;

- First Amendment claim that Defendant D. Davis read his confidential legal communications;

- Fourteenth and Eighth Amendment claims that Mr. Johnson was improperly held in long-term segregation in conditions that were unsanitary and harmful to his mental health against Defendants Reagle, Zatecky, Bodkin, Long, and Nelms; and

- Eighth Amendment claims for exposure to tear gas while housed in segregated housing against Defendants Carter, Zatecky, J. Davis, and J. Johnson.

The defendants seek summary judgment on each of these claims.

**A. Retaliation**

First, Mr. Johnson claims that his "confinement in the IDOC…by defendants Carter, Hudson, Bodkin, Zatecky, and others, especially while at PCF, has been politically motivated, in

9

retaliation for, and in response to and calculated to suppress his political views and expression and the content of his writings, especially those about jail and prison conditions." Dkt. 1 at 6.

To succeed on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Defendants Carter, Hudson, Bodkin, and Zatecky argue that Mr. Johnson cannot succeed on his retaliation claim because he cannot satisfy the third element of his claim – that they took any action against him in retaliation for his speech. "The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680. This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action. *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013); *cf. Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (probable cause usually defeats retaliatory arrest claim but not if plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals who did not engage in the same sort of protected speech were not). Nonetheless, "[a]llegedly protected speech cannot be proven to

motivate retaliation if there is no evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999).

Mr. Carter, the Commissioner of the IDOC, had minimal involvement in the day-to-day operations of the facility. Dkt. 137-14 at ¶¶ 5, 6. There is no evidence that Mr. Carter was directly involved in Mr. Johnson's incarceration or, even more, that he made any decisions about Mr. Johnson's treatment because of Mr. Johnson's speech. Mr. Zatecky was aware that Mr. Johnson had written several articles complaining about aspects of his incarceration at PCF, but he affirms that he never took any negative action against Mr. Johnson because of any article that Mr. Johnson wrote or any complaint or grievance that he filed. Dkt. 137-6 at 2, ¶¶ 13, 14. There is also no evidence on the record that Ms. Hudson played any part in Mr. Johnson's transfer to Indiana or his incarceration at PCF. Finally, there is no evidence that Ms. Bodkin, who did not have authority over where an inmate was housed and was not involved in facility maintenance, but instead was simply involved in the grievance process, took any adverse action against Mr. Johnson because of his writings. Dkt. 137-7 ¶ 4-5. Having failed to respond to the motion for summary judgment, Mr. Johnson has failed to designate any evidence to show that any of these defendants' actions were motivated by retaliation. They are therefore entitled to summary judgment on this claim.

### B. Access to Subscriptions

Next, Mr. Johnson claims that Defendants D. Davis, Conyers, Chambers, Long, Turney, Wyatt, and Ferguson denied him periodicals and other materials to which he had a subscription in violation of his First Amendment rights.

Defendants Davis, Conyers, and Ferguson argue that they are entitled to summary judgment on this claim because they were not personally involved in the alleged constitutional deprivation. "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged

constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Because there is no evidence that defendants Davis, Conyers, and Ferguson were personally involved in the alleged confiscation of his mail, they are entitled to summary judgment on this claim.

The remaining defendants argue that any confiscation of incoming mail was necessary to maintain the safety and security of the facility. At PCF, if a piece of incoming mail has any potential to threaten the security of the facility according to the policy on Offender Correspondence, mail room staff would notify Ms. Chambers, and she would alert the II team. Dkt. 137-10 ¶¶ 3-6. Determinations as to whether a specific piece of mail posed a security threat were made on a case-by-case basis. *Id*. ¶ 12. Mr. Turney, the assistant lead investigator, reviewed several pieces of mail addressed to Mr. Johnson, including the *San Francisco Bay View* and the *Militant* for potential security threats. Dkt. 137-8 ¶ 10-11. Periodicals were confiscated on occasion because they called for protests within the facility, which the II team determined could lead to violence. *Id*. ¶ 13. On other occasions, the II team reviewed Mr. Johnson's mail and determined that there was no security threat and allowed the mail to go through to Mr. Johnson. *Id*., ¶ 14.

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Courts weigh several factors in determining whether a regulation is reasonably related to legitimate penological interests including: (1) whether a valid, rational connection exists between

the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable. *Id.*

Prisons have great latitude in limiting the reading material of prisoners. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (citing *Thornburg v. Abbott*, 490 U.S. 401, 413 (1989)). Therefore, courts have allowed exclusion of materials that create a risk of disorder. *Id.* (citing cases). Here, the defendants have shown that Mr. Johnson's subscriptions were reviewed on a case-by-case basis and only those materials that threatened prison security, specifically materials that called for riots and could lead to violence, were confiscated. Having failed to respond to the motion for summary judgment, Mr. Johnson has failed to designate contrary evidence. The defendants are therefore entitled to summary judgment on his claim based on access to publications.[2]

---

[2] The defendants further argue that they are entitled to qualified immunity on this claim and Mr. Johnson's claim that he was denied the ability to communicate with attorneys. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). Here, and as explained below, the Court finds that Mr. Johnson has not shown that the defendants violated his constitutional rights. Further, Mr. Johnson has presented no facts or argument to show that any such right was clearly established at the time of his allegations. The defendants are therefore entitled to qualified immunity on both claims.

**C. Access to Attorney Claims**

Next, Mr. Johnson claims that defendants Reynolds, Turney, Williams, Shepherd, Cochran, Zatecky, Safford, Evans, and Lyttle denied him the right to correspond with an attorney and denied him confidential phone calls with his attorney. His claims regarding access to an attorney are based on two incidents: (1) when he was not allowed to add Dustin McDaniels, an attorney from Pennsylvania, to his call list; (2) when he was denied a confidential phone call with attorney Rich Waples; when defendant Davis read confidential legal communications.

The defendants argue that Mr. Johnson has not shown that he suffered an actual injury because their alleged denial of his right to communicate with counsel. "Even in the field of constitutional torts, there is no tort without an actionable injury caused by the defendant's wrongful act." *Fields v. Wharrie*, 740 F.3d 1107, 1111 (7th Cir. 2014). Mr. Johnson's claims that his contacts with attorneys were hindered is understood to be a claim that he was denied access to the courts. *See Guajardo-Palma v. Martinson*, 622 F.3d 801, 802 (7th Cir. 2010). To prevail on an access-to-courts claim, a prisoner must "submit evidence that he suffered actual injury—i.e., that prison officials interfered with his legal materials—and that the interference actually prejudiced him in his pending litigation." *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013) (citations omitted).

Here, Mr. Johnson alleges that he was not allowed to speak with a lawyer about pending litigation in Virginia and potential litigation in Texas. Dkt. 1 at 8. But he does not present evidence that he was represented by counsel at that time. He further does not designate evidence that the alleged deprivation prejudiced his ongoing or potential litigation. He therefore has not shown that he was denied access to the courts by the delay in adding Mr. McDaniels to his call list. In addition, while Mr. Johnson alleges that he was denied a confidential phone call with Mr. Waples on one occasion, Mr. Waples was not his counsel at that time. He also alleges that defendant Davis read

confidential papers, but he does not designate evidence to describe those papers. And, again, Mr. Johnson does not designate that these actions hindered pending litigation in any way. Because Mr. Johnson has not shown that he was harmed by the alleged denials of communicating with attorneys, the defendants are entitled to summary judgment on the access-to-attorney claims.

### D. Fourteenth Amendment

Mr. Johnson next claims that he was improperly held in long-term segregation without adequate review. A prisoner receives adequate due process if "prison officials periodically review whether an inmate placed in [] segregation continues to pose a threat." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017). Prisoners are entitled to "an informal and nonadversary periodic review (the frequency of which is committed to the discretion of the prison officials) that keeps administrative segregation from becoming a pretext for indefinite confinement." *Id*. at 525 (internal quotation omitted). The Court considers the following in determining whether a prisoner received due process: (1) the private interest affected by the decision to keep the prisoner in restricted housing; (2) the governmental interests at stake in the decision; and (3) the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value of any additional or substitute procedural safeguards. *Isby,* 856 F.3d at 525 (citing *Hewitt v. Helms*, 459 U.S. 460, 468 (1995)).

Mr. Johnson was placed in DWARSH by IDOC central office because he had an extensive disciplinary record in previous facilities where he was housed in other states. Dkt. 137-4 ¶¶ 5, 6. The Virginia Department of Corrections requested that he be transferred to Indiana because he "continually opposed Virginia's security practices, policies and procedures" and he "has a propensity toward violence and attempts to assault staff when he feels it will promote his radical ideology." Dkt. 137-3 at 3-4. He was also given numerous reviews and classification hearings

throughout his time in DWARSH, which eventually led to him being recommended for a transfer from DWARSH. Dkt. 132-5 at 1, 10, 16, 18, 19, 23, 26. Because Mr. Johnson has not responded to the motion for summary judgment, he has not designated evidence that these reviews were sham or were not meaningful, the defendants are entitled to summary judgment on his due process claims.

### E. Eighth Amendment Claims

Finally, Mr. Johnson alleges that defendants Reagle, Zatecky, Bodkin, Long, and Nelms violated his Eighth Amendment rights when he was in segregation and when he was exposed to tear gas.

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

First, Mr. Johnson alleges that when he was in DWARSH, he was exposed to smoke, feces, cockroaches, trash piles, unsanitary food, and noise. The defendants all argue, however, that there is no evidence that any of the defendants were aware of, or responsible for, the conditions he allegedly experienced. Having failed to respond to the motion for summary judgment, Mr. Johnson has failed to designate evidence that any of the defendants were personally responsible for the conditions he experienced. The defendants are therefore entitled to summary judgment on these claims. *See Colbert*, 851 F.3d at 657.

Next, the defendants move for summary judgment on Mr. Johnson's claim that he was exposed to tear gas once a month arguing that this does not constitute a sufficiently serious condition. Mr. Johnson claims that he suffered exposure to tear gas once a month and that once, he asked Defendant Johnson for a decontamination shower, but was not provided with one. Dkt. 137-1 at 94:14, 100:13-25. Mr. Johnson was never personally targeted with tear gas. *Id*. at 94:23. Nor has he provided evidence of serious injury from his indirect exposure. Mr. Johnson has not shown that occasional indirect exposure to tear gas is a sufficiently serious condition to constitute an Eighth Amendment violation. *See Stone v. Couch*, No. 1:19-CV-01193-TWP-DML, 2021 WL 4247870, at *6 (S.D. Ind. Sept. 17, 2021) ("Courts have routinely held that lingering effects of being pepper-sprayed or exposed to similar chemical agents are not objectively serious medical conditions."). Because he has not responded to the motion for summary judgment, Mr. Johnson has not shown that his exposure to tear gas constituted a serious condition for Eighth Amendment purposes, and the defendants are entitled to summary judgment.

# IV.
## Conclusion

The defendants' motion for summary judgment, dkt. [136], is **granted**. Judgment consistent with this Order and the Order of February 3, 2021, dkt. [7], shall now issue.

SO ORDERED.

Dated: March 13, 2024

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana


Distribution:

KEVIN JOHNSON
1007485
VADOC Central Main Distribution Center
3521 Woods Way
State Farm, VA 23160

All Electronically Registered Counsel